(No. 56022.—

*In re* CLAUDIA K., a Minor, Appellee (Wauconda School
District No. 118 *et al.*, Appellants).

*Opinion filed June 1, 1982.—Rehearing
denied October 1, 1982.*

Brydges, Riseborough, Morris, Franke & Miller, of Waukegan (Ralph Miller, Leo J. Athas, and John M. Collins, Jr., of counsel), for appellants.

Brooke R. Whitted and Matthew David Cohen, of

Canel, Aronson & Whitted, of Chicago, for appellee.

Julia Quinn Dempsey, Bernetta D. Bush, and Eugene M. Daly, for *amici curiae* State Board of Education, and Dr. Donald G. Gill, State Superintendent of Education.

JUSTICE UNDERWOOD delivered the opinion of the court:

Respondents, Wauconda School District No. 118 and the Special Education District of Lake County (collectively referred to here as the District), appeal from a judgment of the circuit court of Lake County issuing a writ of *mandamus* commanding the District to pay care and treatment costs for Claudia K., a minor ward of the court. We allowed a motion under Rule 302(b) to transfer the appeal from the appellate court to this court. 73 Ill. 2d R. 302(b).

Claudia K., who had received "A's" and "B's" in ninth grade, was not doing well when she quit school in the 10th grade. The record does not reflect the date she stopped attending, but she was not enrolled in September 1980. During that month, and just a short time before her 17th birthday, she was arrested in a tavern and taken to the police station. She struggled with an officer, kicking him several times, and when placed in a cell she started a fire by igniting the blankets. A delinquency petition was subsequently filed charging her with arson, and she was held in a youth detention home because of her past "psychiatric history." The court also ordered that psychiatric diagnostic tests be conducted. Her mother, Mrs. I., refused to let Claudia come back home. At the subsequent hearing Claudia admitted the arson charge, and her mother and stepfather, after relating her three attempted suicides and their inability to control her, again refused to take her home. The court ordered Claudia placed in a foster home, and the cause was continued for further reports and consideration. In October she was adjudged a delin-

quent, placed on probation and continued in the foster home.

In December, the court was informed by the probation department that Claudia's psychologist had recommended that she be transferred from Ravenswood Hospital to Barclay Hospital. There is no explanation in the record how or why Claudia was in Ravenswood, but the transfer request was in part due to the expiration of her benefits under a public aid program. The court directed that she be placed in Barclay for about two weeks, and ordered Lake County to pay the substantial costs amounting to $235 per day for the hospital and $400 per week in psychiatrist's fees. In February 1981, Claudia was admitted to Ridgeway Hospital, an institution serviced by Associates in Adolescent Psychiatry, S.C. (AAP).

In April a supplemental petition was filed by the State's Attorney to change Claudia's status to that of a neglected minor. After hearing the testimony that she was actively suicidal, subject to severe mood swings and bouts of deep depression, and that, if released, she would probably commit suicide, the court vacated its previous adjudication of delinquency and adjudged Claudia a neglected minor. The Department of Children and Family Services (DCFS) was appointed temporary guardian; and the administrator of Ridgeway Hospital was ordered not to release Claudia except on notice to the probation department and then to release her only to the probation officer. The District was admonished to complete its case study evaluation of Claudia, whose mother had apparently reenrolled her in school in March, including participation from DCFS and DMHDD (Department of Mental Health and Developmental Disabilities).

The District's involvement in this case results from obligations imposed upon it by Federal legislation (Education for All Handicapped Children Act of 1975, 20 U.S.C. sec. 1401 *et seq.* (1976)), and regulations promulgated

thereunder (34 C.F.R. pt. 300 (1981)), together with the School Code (Ill. Rev. Stat. 1979, ch. 122, pars. 14—1 through 14—14.01) and rules promulgated thereunder by the Illinois State Board of Education (ISBE) ("Rules and Regulations for the Administration and Operation of Special Education in Illinois," effective February 1, 1979; see 3 Ill. Reg. 932-1004 (Jan. 12, 1979), and subsequent amendments). Pursuant thereto the District must prepare, in conjunction with the parents of the child and representatives of other State agencies (*i.e.*, DCFS, DMHDD) who might be involved at some point in providing related services, an Individualized Education Program (IEP) for every child eligible for special education services. Claudia's IEP was not fully determined at the multi-disciplinary staff conference because it was felt that she first needed to be stabilized—the IEP "to be implemented when suicidal issues are settled." The School Code (Ill. Rev. Stat. 1979, ch. 122, par. 14—8.02) provides that either the parents or the District may appeal through an established administrative process if dissatisfied with the proposed IEP, but no appeal was taken.

In June Dr. Marvin Schwarz, Claudia's attending physician and president of AAP, and Claudia's mother (petitioners) sought a writ of *mandamus* to compel the District to place Claudia in an appropriate residential facility and to pay in full for all special education and related services. Following several hearings the court in July found that Claudia was a handicapped child eligible for special education and related services under both State and Federal laws and issued a writ commanding the District to place her in "an appropriate residential facility" and to assume "full financial responsibility" therefor.

In August Dr. Schwarz and Mrs. I. petitioned for a rule to show cause why the District should not be held in contempt, alleging the District had not made good-faith efforts to place Claudia. An amended order was thereaf-

ter entered directing placement by September 25. In November, after the District's fruitless search of possible out-of-State facilities, which the court found was made in good faith, Claudia was still at Ridgeway Hospital, which had been providing her with free services and was complaining that it could not do so much longer. At this point, and after much argument and discussion, the court entered the order from which this appeal is taken. That order, which incorporated by reference earlier orders and findings, directed the District to assume total financial responsibility for Claudia's care at Ridgeway from August 30 to December 14, 1981, including hospital expenses as well as fees for professional services rendered by AAP. In addition the order provided that Claudia be transferred to Riveredge Hospital on December 14 for a period of diagnosis and evaluation until January 22, 1982. Costs of that care and treatment were to be paid in full by the District, which was also to pay for all ongoing treatment by AAP after December 14. The order was bottomed on the court's findings that Claudia was a handicapped student entitled to special education and related services; that psychotherapy was a related service; that the District, despite its duty to do so, had failed to supply an appropriate residential placement for Claudia; that there were no appropriate State facilities available; and that Ridgeway Hospital was an appropriate placement.

The underlying problem in this case is one of liability for the cost of the intensive and expensive treatment ordered for Claudia. Simply stated, her mother and her doctor argue that the therapy she requires is necessary for her to make educational progress; therefore, under Federal and State law the District must provide it free. The District maintains that it has a responsibility to provide medical services only for diagnostic and evaluative purposes and that the treatment of her suicidal condition is a medical problem; therefore, psychotherapy, which the Dis-

trict considers a medical "curative" treatment, is outside its responsibility. Moreover the District argues that, because of the suicide problem, Claudia is uneducable and psychotherapy cannot be a service "related" to an educational program which cannot be developed. Many other issues are argued, but in view of our conclusion we need discuss only the few which follow.

Claudia's mother clearly has standing under the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, pars. 701—20, 704—1) to file petitions in juvenile actions involving her daughter. (*Cf. In re Jennings* (1977), 68 Ill. 2d 125, 129-31 (discussion of the operation of sections 1—20, 4—1, and 4—3).) Since she joined in the petition for the writ of *mandamus* there is no reason to address respondents' argument that Dr. Schwarz and AAP did not have standing.

Respondents also contend that, in a proceeding under the Juvenile Court Act, the circuit court has no *mandamus* power other than that contained in section 5—8(2) of the Act, and that a school district is not an agency as therein specified and defined in section 1—6 (Ill. Rev. Stat. 1979, ch. 37, pars. 705—8(2) and 701—6). However, this court said in *In re Greene* (1979), 76 Ill. 2d 204, 213, "the juvenile court is simply a division of the circuit court (Ill. Rev. Stat. 1977, ch. 37, par. 701—8; *People v. Jiles* (1969), 43 Ill. 2d 145, 147) which, under article VI, section 9, of the Illinois Constitution of 1970, has jurisdiction of all justiciable matters." The writ of *mandamus* was long known at common law (*People ex rel. German Insurance Co. v. Williams* (1893), 145 Ill. 573, 577; 55 C.J.S. *Mandamus* secs. 2(a), 6 (1948)) and has long been recognized to lie within the inherent power and jurisdiction of our circuit courts (*e.g., People ex rel. Dickinson v. Board of Trade* (1901), 193 Ill. 577, 580-81; see also *People ex rel. Baird & Warner, Inc. v. Lindheimer* (1939), 370 Ill. 424). Rather than restricting the general power and jurisdiction of the circuit court in a juvenile proceeding, as respond-

ents contend is the effect of the language in section 5—8(2), it would appear from the scanty legislative history available that the sole purpose of that amendment was to make clear that the juvenile court could compel recalcitrant State custodial agencies to fulfill their obligations. (See comments of Sen. Netsch during Senate debates on S.B. 313, at 269 (May 24, 1979).) The cases of *In re Washington* (1976), 65 Ill. 2d 391, and *In re Owen* (1973), 54 Ill. 2d 104, relied on by petitioners, are inapposite here as both dealt with the power of a juvenile court to interfere in the internal administrative procedures of the Department of Corrections, and did not concern the power of the court, through *mandamus,* to compel compliance with statutory or constitutional duties.

Nor do we find merit in respondents' present argument that they were not afforded a proper forum to contest the petition for the writ because juvenile proceedings are nonadversarial in nature and that the judge, who must act in the best interest of his ward, could not be impartial. Respondents were given ample opportunity to plead and to argue in the trial court, and at no time contended that the judge, because the action involved the rights of his ward, could not be impartial. Consequently, the issue was waived. *Brown v. Lober* (1979), 75 Ill. 2d 547, 556; *People ex rel. Rappaport v. Drazek* (1975), 30 Ill. App. 3d 310, 315.

The dispositive issue is whether the writ was properly issued in this case. *Mandamus* is appropriate only where there is a clear right to the requested relief, a clear duty on the part of the respondent to act, and clear authority in the respondent to comply with the terms of the writ. (*United States ex rel. Girard Trust Co. v. Helvering* (1937), 301 U.S. 540, 543, 81 L. Ed. 1272, 1277, 57 S. Ct. 855, 857; *Horn v. Rincker* (1981), 84 Ill. 2d 139, 148; *People ex rel. Cannella v. City of Chicago* (1955), 7 Ill. 2d 416, 418; *People ex rel. Brecheisen v. Board of Review* (1936),

363 Ill. 106, 112-13; *Thornton, Ltd. v. Rosewell* (1977), 51 Ill. App. 3d 373, 377; *Naporano Metal & Iron Co. v. Secretary of Labor* (3d Cir. 1976), 529 F.2d 537, 542; *In re B & B Properties, Ltd.* (N.D. Ga. 1976), 423 F. Supp. 23, 26; 52 Am. Jur. 2d *Mandamus* secs. 64, 73 (1970); 55 C.J.S. *Mandamus* sec. 12 (1948); see also *People ex rel. Polen v. Hoehler* (1950), 405 Ill. 322, 330; *cf. West Side Organization Health Services Corp. v. Thompson* (1980), 79 Ill. 2d 503; *People ex rel. Maro v. Board of Auditors* (1971), 48 Ill. 2d 202.) As this court said in *People ex rel. Callahan v. Whealan* (1934), 356 Ill. 328, 334, "It has been long the rule in this State that a relator in *mandamus* must show a clear and undoubted right to the relief prayed and a corresponding duty on the part of the respondent to do the act sought to be compelled."

Many difficult questions are involved in the issues of Claudia's "clear right" to the services which have been ordered to be provided and the "clear duty" of the District to provide them. Those questions include: the effect to be given Federal regulations in a State court where regulations of the designated State enforcement agency conflict; the effect, if any, of "letters of finding" by a Federal oversight agency which indicate State regulations are not in compliance with Federal guidelines; the effect of a Federal court's order enjoining certain State enforcement agency practices where the agency has not altered its policy (see *Gary B. v. Cronin* (N.D. Ill. 1980), 542 F. Supp. 102, 3 Educ. for Handicapped L. Rep. 552:144), as well as an overriding concern as to how to implement a Federal program which arguably mandates comprehensive care plans without providing sufficient resources for implementation. It will suffice to discuss only whether a clear duty existed on the District's part.

It is contended by the District that it has no power or authority to place Claudia in an institution which is not approved for placement by the Illinois State Board of Ed-

ucation and that neither Ridgeway Hospital nor Riveredge Hospital is an approved institution. Petitioners have apparently conceded that the two hospitals are not approved as they have not argued the issue in their brief here. We note in the record, however, a letter from the program approval section of the Illinois State Board of Education dated October 26, 1981, to the special education district concerning Claudia. That letter indicates that Riveredge was approved in October by the Governor's Purchased Care Review Board for 1981-82 but that no new placements there would be allowed in 1981-82. Whether the refusal to approve further placements in 1981-82 resulted from a shortage of funds or other factors is not disclosed by this record. However during the hearings on the petition, it was argued that the School Code does not forbid placement in a nonapproved institution but states only that such placement would not entitle the District to reimbursement from the State.

Under section 14—7.02 of the School Code (Ill. Rev. Stat. 1979, ch. 122, par. 14—7.02) a district is authorized to place children in out-of-State and private special education facilities, under certain restrictions, and reimbursement of the district for certain expenses is provided. The first sentence of the second paragraph of this section states: "No child shall be placed in a special education program pursuant to this Section if the tuition cost for special education and related services increased more than 10 percent over the tuition cost for the previous year or exceeds $4,500 per year unless such costs have been approved by the Governor's Purchased Care Review Board." (Ill. Rev. Stat. 1979, ch. 122, par. 14—7.02.) Even if, however, this sentence could be construed as authorizing placement in a nonapproved institution while only denying reimbursement, a regulation governing District conduct in this area leaves no doubt as to the absence of placement authority:

"No nonpublic facility shall be utilized by a district until: (1) The facility is approved by the SBE, (2) Costs have been established for it by the Governor's Purchased Care Review Board, (3) Proposed residential placements are reviewed and approved by the Illinois State Board of Education prior to placement ***." Adopted Amendments to the Rules and Regulations for Approval of Non-public Facilities Educating Handicapped Students under section 14—7.02 of the School Code, 5 Ill. Reg. 4577 (April 24, 1981).

Clearly the District had no authority to place Claudia in Ridgeway, which was unapproved, and Riveredge where, even if it was cost approved by the Purchased Care Review Board, Claudia had been denied placement by ISBE. "The writ of *mandamus* confers no new authority upon the person or body against whom it is issued—it creates no duty, but will issue only where the duty and authority to act already exist without the writ." (*People ex rel. Brecheisen v. Board of Review* (1936), 363 Ill. 106, 112-13; see also *People ex rel. Cannella v. City of Chicago* (1955), 7 Ill. 2d 416.) Given the impermissibility under the Illinois regulations of Claudia's placement by the District in either of the facilities for the cost of her care in which it had been ordered to pay, and the substantial doubts as to the proper resolution of the Federal-State questions earlier alluded to, it is clear that the writ of *mandamus* should not have issued against the District.

In disposing of this case on the procedural issue we recognize the possibility that further action by the trial court may be required. Nothing in this opinion is intended, of course, to preclude the authorization of such care and treatment of Claudia as the evidence may establish to be necessary and proper, or the joinder of those parties properly required for its implementation.

We accordingly reverse the judgment of the circuit court of Lake County and remand the cause to that court for such further proceedings as may be appropriate.

*Reversed and remanded.*