*In re* DONTE A. *et al.*, Minors (The Department of Children and Family Services, Petitioner and Cross-Respondent-Appellee, v. Charlene T., Respondent (Donte A. *et al.*, Minors, Cross-Petitioners-Appellants)).

First District (2nd Division)   Nos. 1—91—0779, 1—91—0783, 1—91—0793 cons.

Opinion filed March 8, 1994.

Patrick T. Murphy, Public Guardian, of Chicago (Michael G. Dsida, of counsel), for appellants.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Jeffrey W. Finke, of Raleigh & Helms, Special Assistant Attorney General, of counsel), for appellee.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

The question this case presents is whether, when appointing a guardian with the power to consent to adoption, the circuit court has the authority to limit that power by requiring the guardian to provide pre-adoption sibling visitation and to consent to adoption only if the prospective adopting family agrees to reasonable post-adoption sibling visitation. For the reasons that follow, we hold that it does not.

The events leading to this appeal began in January 1985, when the Department of Children and Family Services (DCFS) was awarded custody of Donte, David, Dewon, Derrick, and Demarcus A., after petitioning for adjudication of wardship for all five boys. The two youngest, Demarcus and Dewon, were allowed to remain with their mother, Charlene T., under an order of protection; the other three were ordered temporarily into DCFS custody, but within a week were returned to their mother under an order of protection. Three months later, DCFS petitioned for and obtained custody of all five children because the mother had not attended substance abuse programs and, in violation of the order of protection, had used excessive corporal punishment. Sometime prior to August 1986, the boys were placed in three foster homes: Derrick and David in one, Donte in another, and Demarcus and Dewon in a third. On November 17, 1987, after a hearing, the circuit court entered dispositional orders giving DCFS custody and guardianship of the five boys, with their parents' agreement. Few visits among the children or between the children and either parent occurred in the subsequent year, despite repeated court orders that DCFS arrange such visits and a DCFS caseworker's ready acknowledgement, at one of the interim hearings, that it "had been remiss in keeping with a regular visiting schedule with all the minors."

Just before Christmas 1988, the boys filed a supplemental petition asking the court to order DCFS to provide, at a minimum, monthly visits among them, and to allow regular telephone contact. At the hearing the next month, a caseworker from another agency, which had responsibility for two of the children, testified that attempts had been made to bring the children together, but that all

but one such attempt had been cancelled due to illness or similar events. The court refused to enter the order requested, and it suggested that the children file another supplemental petition in the future if no visits took place. Over objections by the attorneys for the mother and the children, the court also transferred the matter to the guardianship calendar, a less active call with no scheduled review.

About six months later, in June 1989, DCFS filed supplemental petitions for four of the children, requesting termination of the mother's parental rights and appointment of Gary T. Morgan, the DCFS guardianship administrator, as guardian with the right to consent to their adoption. The boys' father had died. In reply, the four boys filed cross-petitions, asking the court to find that it was in their best interests to have semi-monthly visits with one another and with Donte, and to order Morgan to provide such visits while he was their guardian. The cross-petitions also asked that if the court granted the DCFS petitions, it simultaneously order Morgan to refrain from consenting to adoption by anyone unwilling or unable to make such arrangements. DCFS did not file a petition to terminate the mother's parental rights as to Donte, but he too filed a supplemental petition, asking for visitation.

The hearing on the DCFS petitions began on July 17, 1990. Generally, the testimony was that sibling visits were in the boys' best interests. For example, Dennis McGuire, a social worker and therapist, testified for the minors as an expert on the role of sibling relationships in a child's development. In his opinion, arrangements should have been made for the children to see each other at least twice a month, and any pending adoption process would be unaffected, or helped if anything, by such visitation, even though traditionally it was recommended that children "never look back" to their biological families after adoption. McGuire had not met the children prior to the day of his testimony, but he had read the DCFS treatment plan and a two- or three-year-old social summary to familiarize himself with the children's circumstances. Likewise, Donald Edgren, the DCFS caseworker for the children for a number of years, testified that in his opinion, "it is in the best interest of children generally to have visitation with each other" when siblings cannot be placed with the same family. He testified that various DCFS service plans had included a task to arrange sibling visits to maintain family contact, but that few visits had occurred. He too mentioned difficulty in arranging visits with the parents. In addition, Sidney Goldberg, the DCFS caseworker for Donte since May 1989, testified that he believed that it was in Donte's best interest to have sibling visitation with his brothers even if the others were adopted or he was adopted, saying,

"[t]o me[,] it is as basic as eating lunch." In the opinion of Jeanna Ogwude, the Volunteers of America caseworker for David and Derrick since December 1989, it was in the best interest of the two boys that Morgan be appointed guardian with power to consent to adoption, for their foster parents wanted to adopt them; she also believed that it would be in the boys' best interest to visit with their other brothers regularly, even after adoption. She testified that the sibling visits since she became the boys' caseworker had not caused any significant behavior problems, and that the visits had not affected in any way their attachment to their foster parents.

The only testimony presenting the opposite view was that of Roberta Molonar, since January 1989 the DCFS caseworker for the family, especially Dewon, Donte, and Demarcus. She had been an adoption worker for over nine years, averaging 25 to 28 adoptions per year. In her opinion, finding Dewon and Demarcus an adoptive home would be "nil" unless the mother's parental rights were terminated and Morgan were appointed guardian with right to consent to adoption, for the boys' aunt and uncle, with whom they were living, would not adopt them and did not want to provide a foster home for an extended period. She agreed that "there [wa]s nothing to suggest that sibling visits among the boys [wa]s not in their best interest," including Donte, and she believed that sibling visitation prior to adoption would be "important," and "very nice" after adoption, assuming the mother's parental rights were terminated. Nevertheless, she characterized mandatory post-adoption sibling visits as "just another shackle" around a "prospective adopting family," commenting that finding them an adoptive home would be almost impossible if there were an order for post-adoption visitation.

Some of the minors also testified, as did their mother. Derrick, Donte, and Demarcus all testified to the effect that they wanted to see each other everyday if possible. Charlene T., the mother, testified that the oldest three children had been removed from her custody for six months sometime prior to 1985 because the father had become "very violent, abusive," but that they had been returned home after a trial. In 1985, she decided to turn the children over to DCFS voluntarily. She testified that she occasionally had unsupervised visits with the children, which DCFS did not know about, and that she had difficulty arranging the formal visits. When she attempted to telephone her children, Donte's foster mother would not allow it but the other two foster mothers did.

At the close of the testimony, the assistant State's Attorney argued that as proof of the mother's unfitness, she had made no reasonable efforts to regain custody of the children in that she had not

fulfilled even the simplest requirement of the service plans, that is, visitation. He also argued that it was in the four boys' best interest to have Morgan appointed guardian with right to consent to adoption because David and Derrick were in a good, pre-adoptive home, and the placement opportunities for Dewon and Demarcus would be severely hampered otherwise.

The children asked that the appointment be denied because Morgan did not deserve the "unfettered right" to consent to adoption after DCFS's history of failure in providing contact so that they could develop and maintain their relationships with each other. As an alternative, they suggested that the court limit Morgan's right to consent to adoption so that only adoptive parents who were willing and able to facilitate sibling visitation would be approved. The boys also asked that Morgan be required to provide visitation for them prior to any adoption, in light of the general agreement among the witnesses that sibling visits were in the boys' best interest, the desire of the boys themselves, and the willingness of the foster parents of David and Derrick and of Dewon and Demarcus. Without such an order, they warned, no visitation would occur, as indicated by DCFS's history of not arranging visitation until threatened with a court order in December 1988.

DCFS opposed the boys' cross-petitions to limit Morgan's right to consent, albeit agreeing that the boys should see each other, on the ground that Illinois law is "that courts do not have the authority to allow post-adoption sibling visitation" because the adoption statute was written when the public policy was to sever completely all biological relationships when adoption occurs, as in the child's best interest.

The mother argued that the State had not met the burden of proof on unfitness, claiming that DCFS had failed to help the family reunite. She asserted that it was illogical to ask for termination of her parental rights with regard to only four of the five boys, reasoning that if she was a fit parent for Donte, she must be fit for the others, too. She alternatively contended that stability was in the children's best interest, that sibling visits would provide that continuity, and that it was not in the children's best interest to sever their ties with one another, so to appoint Morgan guardian with the limitations advocated by the boys' petitions would be appropriate.

The court found the mother unfit because she "failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children," and "failed to make reasonable progress for return of the children." The court then stated,

> "Unfortunately, I do not have the authority to order sibling visits. Although, I might prefer it.

I had a similar case [citation]. I researched the law and found disagreement among most judges in the research in New York. One county said we have no right to order sibling visits. That's the legislature's function. So they couldn't agree. And I believe it is up to the reviewing courts of our State to determine what should be done.

I do not have the authority to overrule the State legislature. So I refer you to my decision in [the prior case] and I'll not order sibling visits.

\* \* \*

I am not limiting the guardianship. I just want to show if I had the authority I would do that, but I don't have the authority."

Without further explanation, the court also refused to order sibling visits for Donte, but it did agree to make a finding that it was in the best interest of the children to have sibling visits. The court denied an oral motion to stay adoption pending appeal, but it agreed that it had determined that "it is in the best interest of the [four] for [them] to have visitation with the siblings until and after [their] adoption but this court lacks authority to enter such an order." The court apparently did not rule separately on Donte's supplemental petition.

## I

To understand the procedural posture of this case requires a brief overview of the statutory scheme. Generally, guardianship proceedings are governed by section 2—27 of the Juvenile Court Act of 1987. (Ill. Rev. Stat. 1991, ch. 37, par. 802—27 (now codified at 705 ILCS 405/2—27 (West 1992)).) It provides in part that when parents are unfit, services to reunite the family have been unsuccessful, and it is in the child's best interest to be removed from the parents' custody, the DCFS guardianship administrator may be appointed as guardian; such proceedings do not require termination of parental rights. In addition, the Juvenile Court Act defines "guardianship" as "the authority and duty of reasonable visitation, except to the extent that these have been limited by court order." Ill. Rev. Stat. 1991, ch. 37, par. 801—3(8)(b) (now codified at 705 ILCS 405/1—3(8)(b) (West 1992)).

When a child is a ward of the court and is the subject of a petition for adoption, or if a child's parent(s) surrender that child for adoption, however, section 2—29 of the Juvenile Court Act (Ill. Rev. Stat. 1991, ch. 37, par. 802—29 (now codified at 705 ILCS 405/2—29 (West 1992))) comes into play. It states in part as follows:

"If the petition prays and the court finds that it is in the best interest of the minor that a guardian of the person be appointed and authorized to consent to the adoption of the minor, the court with the consent of the parents, if living, or after finding, based

upon clear and convincing evidence, that a non-consenting parent is an unfit person as defined in [section 1 (Ill. Rev. Stat. 1991, ch. 40, par. 1501 (now codified at 750 ILCS 50/0.01 (West 1992)))], may empower the guardian of the person of the minor, in the order appointing him or her as such guardian, to appear in court where any proceedings for the adoption of the minor may at any time be pending and to consent to the adoption. Such consent is sufficient to authorize the court in the adoption proceedings to enter a proper order or judgment of adoption without further notice to, or consent by, the parents of the minor. An order so empowering the guardian to consent to adoption terminates parental rights, deprives the parents of the minor of all legal rights as respects the minor and relieves them of all parental responsibility for him or her, and frees the minor from all obligations of maintenance and obedience to his or her natural parents." (Ill. Rev. Stat. 1991, ch. 37, par. 802—29(2) (now codified at 705 ILCS 405/2—29(2) (West 1992)).)

This provision, like the entire Juvenile Court Act, "shall be liberally construed to carry out the [Juvenile Court Act's] purpose and policy," among which are "secur[ing] for each minor subject hereto such care and guidance *** as will serve the moral, emotional, mental, and physical welfare of the minor and the best interests of the community," as well as "secur[ing] for [a minor removed from the home] custody, care and discipline as nearly as possible equivalent to that which should be given by his or her parents." Ill. Rev. Stat. 1991, ch. 37, par. 801—2(1) (now codified at 705 ILCS 405/1—2(1) (West 1992)).

The Adoption Act (Ill. Rev. Stat. 1991, ch. 40, par. 1500 *et seq.* (now codified at 750 ILCS 50/0.01 *et seq.* (West 1992))), likewise, is to be liberally construed; in fact, it provides expressly that the general rule of strict construction of statutes in derogation of common law does not apply. (Ill. Rev. Stat. 1991, ch. 40, par. 1524 (now codified at 750 ILCS 50/20 (West 1992)).) It too is to be construed so that the best interests and welfare of the person to be adopted are of paramount consideration, and is to be construed in concert with the Juvenile Court Act. (Ill. Rev. Stat. 1991, ch. 40, pars. 1525, 1503 (now codified at 750 ILCS 50/20a, 2.1 (West 1992)).) The Adoption Act contemplates that consent to adoption must be based on the guardian's determination of the child's best interests and approved by the adoption court, at least when, as here, adoption is by licensed foster parents who have had custody of the child for a year or more. In deciding whether to consent, the guardian is instructed to consider "all relevant factors," which expressly include "the value of preserving family ties between the child and the child's relatives, including siblings"; the circuit court, however, has sole discretion in

making the final determination of the propriety of the adoption and must take into account these same factors. (Ill. Rev. Stat. 1991, ch. 40, par. 1519.1 (now codified at 750 ILCS 50/15.1 (West 1992)).) The Adoption Act further provides that the court may deny an adoption to which the guardian has consented if it finds that consent was an abuse of discretion; similarly, if the guardian commits an abuse of discretion by withholding consent, the court may grant an adoption without the guardian's consent. Ill. Rev. Stat. 1991, ch. 40, par. 1519.1(d) (now codified at 750 ILCS 50/15.1(d) (West 1992)).

II

The boys argue that the circuit court erred in ruling that it did not have the authority to grant the cross-petitions or Donte's supplemental petition during the termination proceedings. Specifically, they contend that the court had authority to order Morgan not to consent to adoption unless the adoptive family was able and willing to arrange post-adoption sibling visits or to retain authority to approve Morgan's consent to adoption. They further assert that the court had authority to order Morgan to provide pre-adoption sibling visits. They begin by noting that under the Illinois Constitution (Ill. Const. 1970, art. VI, § 9), circuit courts have jurisdiction over all justiciable matters other than those within the supreme court's exclusive jurisdiction. They reason that this constitutional grant of power enables the circuit court to order a State custodial agency to fulfill its obligations, citing In re Claudia K. (1982), 91 Ill. 2d 469, 440 N.E.2d 78. In addition, they contend, as parens patriae and superior guardian of the children, the court was obliged to look after the interests of its wards while in DCFS care, and to order visitation after DCFS had blithely ignored the children's best interests in the past, as evidenced by its failure to provide visitation while they were in the custody of their guardian since 1987. Finally, they endeavor to distinguish the appellate court decision in In re M.M. (1992), 226 Ill. App. 3d 202, 589 N.E.2d 687, aff'd (1993), 156 Ill. 2d 53, 619 N.E.2d 702, in which the court held that limiting the guardian's authority by ordering parental visits would have been tantamount to placing conditions on the termination of parental rights, subjecting an adoption to potential attack by the parents.

Subsequent to oral argument in this case, the Illinois Supreme Court affirmed the judgment of the appellate court in M.M. (In re M.M. (1993), 156 Ill. 2d 53, 619 N.E.2d 702.) Because that case is so similar to the matter before us, we address it in some detail. M.M. is a consolidation of three appeals (M.M., M.E.B., and A.B.), in which the court was asked to decide whether a circuit court has the power,

when entering an order terminating parental rights and appointing a guardian with power to consent to adoption, to place a limitation or condition on the guardian that consent may be given only if the adoptive parents agree to allow unspecified contact with the child's biological parents or siblings or both. In one of the three cases, A.B., the court terminated parental rights as to one of six siblings and appointed Morgan as guardian with the right to consent to her adoption, but it refused to limit Morgan's consent to a family that would permit contact between the child and her siblings, who also had been removed from the mother's custody. As here, the court stated it had no authority to limit the guardian's power. In the M.E.B. case, the court terminated parental rights and appointed Morgan as guardian with power to consent to adoption, with the limitation that he could consent only if adopting parents would agree to allow contact among the four siblings. When Morgan asked the court to reconsider, it denied the motion. In *M.M.*, the circuit court terminated the parents' rights, but, after finding that it was in the six children's best interests to have contact with one another and with the biological parents, it required that the guardian consent to adoption only if the adopting parents would agree to allow such contact. At the adoption hearing, the children petitioned to enforce the order, and the foster parents refused to adopt if the order was enforced, believing that the adoption would be invalid and would cloud the adoption order, subjecting them to litigation. The adopting parents of some of the children had agreed to the visitation stipulation, but later challenged it. The guardian's petition to remove the limitation was denied.

The appellate court determined that the juvenile court had no authority to limit the guardian's power to consent to adoption, finding that such a limitation would make conditional the termination of parental rights, casting doubt on the finality of the termination order. It also found that such an order "would create an imbalance in the statutory scheme for adoption" (*M.M.*, 226 Ill. App. 3d at 211) because it would restrict the guardian's ability to exercise discretion in considering the factors listed in the Adoption Act as relevant when deciding a child's best interest at the adoption stage. Ill. Rev. Stat. 1991, ch. 40, par. 1519.1(b) (now codified at 750 ILCS 50/15.1(b) (West 1992)).

In affirming the appellate court's judgment, the Illinois Supreme Court held that through the Juvenile Court Act the legislature defined the juvenile court's authority concerning termination and consent to adopt. (*In re M.M.* (1993), 156 Ill. 2d 53, 66, 619 N.E.2d 702.) The court held that the issue of preserving family ties between

the adopted child and his or her siblings is a question to be considered at the time of adoption by the adoption court, and not at the termination proceeding by the juvenile court. (*M.M.*, 156 Ill. 2d at 69-70.) In particular, the juvenile court may not seize upon "the best interests of the child mandate" to impose a requirement of visitation after adoption. (*M.M.*, 156 Ill. 2d at 69-70.) Indeed, after appointing and empowering a guardian to appear in the subsequent proceeding in adoption court, the juvenile court's role in the adoption process ends. *M.M.*, 156 Ill. 2d at 71.

Once an adoptive placement is determined to be in the best interests of the child, the responsibilities concerning the care, custody, and control of the child vest, "solely, in the adoptive parents." (*M.M.*, 156 Ill. 2d at 73.) It is up to them to decide whether to permit or deny continued contact with the child's biological family. (*M.M.*, 156 Ill. 2d at 73.) There is no authority, constitutional or otherwise, "to support the conclusion that biological family ties continue to receive protected status in the face of an adoption." *M.M.*, 156 Ill. 2d at 73.

Subsequent to the supreme court's decision in *M.M.*, we directed the parties to file supplemental briefs discussing the impact of *M.M.* upon this case. The public guardian, for the children, argues that the circuit court made two distinct "best interest" determinations: that it was in the best interest of David, Derrick, Dewon, and Demarcus to appoint a guardian to consent to their adoption, and that it was in their best interest to have visitations with their siblings until and after adoption. The supreme court in *M.M.*, he asserts, suggests that the circuit court has authority to make only one best interest determination, and the question remains intact as to which of the two better serves the needs of the brothers. Further, the rights of a fifth brother—Donte—are involved, and according to the public guardian, under *Aristotle P. v. Johnson* (N.D. Ill. 1989), 721 F. Supp. 1002, Donte's guardian has a duty to provide him with sibling visitation. Finally, the public guardian asserts that *M.M.* fails to resolve the constitutional issue of the children's fundamental right to regular visits with each other, again citing *Aristotle P.*

While the public guardian is correct when he asserts that the circuit court entered a finding that sibling visitation would be in the four boys' best interest, the supreme court in *M.M.* makes it clear that "the juvenile court's best interests considerations, in the context of a termination proceeding, are limited to a determination of whether it is in the child's best interests to be freed for adoption." (*M.M.*, 156 Ill. 2d at 67.) There is no conflict between the circuit court's findings, because only one of those findings is authorized.

Additionally, the supreme court in *M.M.* made it clear that the Juvenile Court Act and the Adoption Act do not permit the juvenile court to make any decision concerning the preservation of family ties. Rather, "[t]he adoption court must be free and unfettered in its deliberations" to consider the issue of preservation of family ties along with all other relevant factors. (*M.M.*, 156 Ill. 2d at 70.) The undefined fiduciary duties or constitutional rights of wards to sibling visitation after adoption do not alter this analysis.

*Aristotle P.* is neither binding nor persuasive. That case, a 42 U.S.C. section 1983 (1988) action, concerned children who had been made wards of the court and placed in foster homes. The United States District Court for the Northern District of Illinois found that "the children['s] relationships with their siblings are the sort of 'intimate human relationships' that are afforded 'a substantial measure of sanctuary from unjustified interference by the State.'" (*Aristotle P.*, 721 F. Supp. at 1005, quoting *Roberts v. United States Jaycees* (1984), 468 U.S. 609, 618, 82 L. Ed. 2d 462, 471, 104 S. Ct. 3244, 3250.) In this case, however, the required "compelling interest that 'cannot be achieved through means significantly less restrictive of associative freedoms' [citation]" (*Aristotle P.*, 721 F. Supp. at 1006) is derived from the adoption, a far more significant step than placement in a foster home. The children may have had a legitimate constitutional right to sibling visitation while in foster care, but that right could be terminated by their adoption. The supreme court in *M.M.* specifically found that "*Aristotle P.* does not address the protection of familial ties in the context of adoption." *M.M.*, 156 Ill. 2d at 73.

Finally, the public guardian's assertion that the instant appeal is not about an adoption is not persuasive. Since the adoption court can sever all family ties as part of the adoption process, even those rights to sibling visitation that unadopted children may have may be severed as to their adopted siblings.

The Illinois Supreme Court's unambiguous holding in *M.M.* is dispositive of the issue in this case. Consequently, the ruling of the circuit court that it had no authority to order sibling visitation in this power to consent to adoption matter is affirmed.

Affirmed.

SCARIANO and McCORMICK, JJ., concur.